IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:07cr139-WKW |
| | ) | (WO) |
| JUAN UBALDO-VIEZCA | ) | |

**<u>RECOMMENDATION OF THE MAGISTRATE JUDGE</u>**

This case is before the court on defendant Ubaldo's motions to suppress (Doc. ## 42, 84). The court heard evidence on the motions on March 10, 2008. For the reasons set out below, the motions are due to be denied.

**Facts**

On June 26, 2007, Alabama State Trooper Will Barnes observed a white Ford Expedition pulling an empty tandem axle utility trailer traveling north on I-65 near Montgomery at 70 m.p.h., despite the fact that the speed limit had dropped to 55 m.p.h. in that location. Barnes pulled the Expedition over and approached on the passenger side. The Expedition was occupied by the driver – Ubaldo's co-defendant, Azucenas Garcia – and two passengers, Ubaldo and Garcia's son. As Barnes approached the truck, he saw a new Fraternal Order of Police sticker and a Texas Department of Public Safety sticker on the back window, and smelled the strong odor of orange air freshener when he arrived at the passenger window. When Barnes asked Garcia for her license, Ubaldo immediately began talking to him. He volunteered that they had not wanted to make any sudden movements before Barnes walked up because there had been problems in their area with the police.

Barnes, who has been trained to recognize various indicators of criminal activity during traffic stops, thought that Ubaldo's statement was inconsistent with the impression conveyed by the stickers that the car's inhabitants were friendly to law enforcement. Barnes obtained Garcia's license and asked for her registration. Garcia could not produce any registration for the truck, but she handed Barnes the title and said that she had recently purchased the truck. Barnes asked Garcia to step out of the vehicle and come to the rear. As he walked toward the trailer, he saw that Garcia's name was not on the title. He inquired further, and Garcia told him that she had not purchased the truck, but that somebody owed her some money and had given her the truck as payment. Barnes also asked Garcia for proof of insurance, which she was unable to produce. Barnes asked Garcia where she was headed, and she said that they were going to North Carolina to buy some cars. Barnes asked whether they were going to an auction, and Garcia replied that they were, but said that she did not know where the auction was. She referred him to her passenger (Ubaldo), and said that he was her partner and he knew where they were going.

Barnes approached Ubaldo and asked him for his identification. While he waited for Ubaldo to produce the identification, Barnes asked Ubaldo where they were headed, and Ubaldo said South Carolina. Barnes asked Ubaldo if he were a car dealer, and Ubaldo said that he was not. Barnes asked how they were going to pay for the cars, and Ubaldo said that he was going to put them on his credit card. After receiving Ubaldo's identification, Barnes asked Garcia to be seated in his patrol car. He called BLOC, the blue light operation center in Gulfport, Mississippi, also known as the High Intensity Drug Trafficking (HIDTA) Watch,

2

to run the personal and vehicle information. Barnes began entering information on his computer to issue warning citations to Garcia while he waited for BLOC to call him back. He asked Garcia about prior arrests, and she indicated that she had only been arrested for a suspended driver's license. A minute or two later, she said that she was also arrested for smuggling people on one occasion, then went on to say that "sometimes I still do it." Barnes also asked Garcia about her relationship to Ubaldo because she had not been able to give Barnes Ubaldo's name. In addition, during this conversation Garcia said that they were going to pay cash for the cars, and indicated that Ubaldo had the money. She also said that they both owned the trailer together.

Barnes gave Garcia warning citations for speeding and for having no proof of insurance. He returned the title and identification papers, then called BLOC again because he had not yet received a return call. When he reached BLOC, Barnes learned that the truck and trailer were both registered to Garcia, that she had numerous prior arrests involving smuggling people across the border, and that she had used an alias. Ubaldo had no prior arrests, but he was entered as a suspect in an ongoing drug investigation. Barnes confronted Garcia about not being honest concerning her criminal history. He began asking her about contraband, weapons and money in the vehicle because he believed that she was involved in criminal activity. Then Barnes asked whether he could search the vehicle and the trailer, and Garcia replied that he could. Barnes asked Garcia whether she read Spanish or English better, and she chose Spanish, so he began filling out the Spanish consent to search form. When it was complete, Barnes asked Garcia to read it and, if she agreed with it, to sign it.

Garcia signed the consent to search form.

Barnes asked Ubaldo and Garcia's son to exit the truck. Ubaldo asked whether he could speak to Barnes away from the boy, and began telling Barnes that he was currently a criminal informant for the DEA, working for an agent named Norris Rogers in the Houston office. He said that Garcia did not know about that, and he did not want her or her son to hear. Barnes asked for a contact number for the agent, but Ubaldo could not provide one. Officers searched the Expedition, but found nothing of evidentiary value. They then turned their attention to the trailer. Barnes checked the axle, where he could see fresh tool marks on bolts securing the spindle and hub assembly to the axle, as though a wrench had been used on them recently, even though the axle itself was rusty. Barnes hit the axle with his flashlight, performing an "echo test" to determine whether it was hollow. He expected a ringing sound, but instead the flashlight produced only a "thud." Barnes found further tool marks on the lug nuts securing the passenger side wheels to the axle, and noticed that one of the dust caps was missing from the end of the hub that holds the grease in the axle and the bearings.

At this point, Barnes felt confident that there was contraband in the trailer axles. He considered conducting his search of the trailer by the roadside but, because of heavy traffic, decided to ask Ubaldo to drive the truck to the auto shop. Ubaldo agreed, and drove the truck to the shop, with Garcia's son as a passenger. On the way to the shop, Barnes told Garcia that he believed that there were narcotics in the axles of the trailer, and asked her if he could check the axles. "Is that o.k.?" Barnes asked, and Garcia said, "Yes." Ubaldo stopped the

4

truck in the driveway of the auto shop and, when Barnes spoke to him, Ubaldo said that he needed to talk with Barnes again. Ubaldo again told Barnes that he was currently working undercover for the DEA on a deal. Barnes said, "Let me guess. There's dope in the axles." Ubaldo said, "Yes." Barnes said, "How much?" Ubaldo replied, "I'm not going to lie. It's eight kilos."

A drug dog that had been brought to the shop by another trooper was shown the trailer, and he alerted for the presence of narcotics. Barnes put Ubaldo in another trooper's truck, and had the Expedition and trailer moved to the back of the auto shop, where the trailer was disassembled. Troopers found 16 packages of cocaine, approximately eight kilos, in the axles of the trailer.

Trooper Fulmer advised Ubaldo of his <u>Miranda</u> rights, while Barnes advised Garcia of her rights. ABI special agent Joe Herman also advised Ubaldo of his rights, in English, after Ubaldo began to volunteer, once again, that he was a DEA confidential source. Ubaldo acknowledged his rights and wanted to talk to Herman. He told Herman, in English, that he was working for an agent named Norris Rogers on a large investigation for the DEA. Herman and Ubaldo then went into the HIDTA office, where Agent Henderson again advised Ubaldo of his <u>Miranda</u> rights using a customs form in English. Ubaldo signed a waiver of rights form. He also gave Herman written consent in English to search his residence in Friendswood, Texas.

Later, Herman contacted Agent Norris Rogers, who said that Ubaldo had been a DEA source some ten years before, but he had not talked to or seen Ubaldo in a significant period

of time.  Pursuant to Ubaldo's written consent to search, as well as consent obtained from Ubaldo's wife at the residence, agents searched Ubaldo's house in Texas. They found two bullet proof vests and one military flak vest.  One of the vests had a bullet hole in the soft trauma plate, one of the panels had a bullet hole with the bullet still lodged in it, and another panel had a large round hole in it with what appeared to be blood around the hole.  Agents also found two 37 millimeter grenade launchers, two submachine gun-type pistols, an AK 47 with its receiver cut, a .22 caliber rifle, a flare gun, several boxes of 9 mm ammunition, a .223 assault rifle, a 12-gauge shotgun, a .223 scope rifle, and several other pistols, along with a new computer and new appliances.

### Discussion

Ubaldo seeks suppression of all physical evidence obtained by law enforcement as a result of the stop and search of the Expedition and attached trailer, as well as from the search of his residence, on the ground that both resulted from Ubaldo's and/or his co-defendant's allegedly illegal stop and detention.  Ubaldo also contends that certain statements that he made to law enforcement without benefit of Miranda warnings, or without benefit of Miranda warnings given in Spanish, his native language, are due to be suppressed.  Finally, he maintains that the arresting officer illegally pulled over the Expedition and detained its occupants because they were Hispanic.

1.    Standing

The United States challenges Ubaldo's standing to seek suppression of evidence in this

case.[1] Clearly, Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. Rakas v. Illinois, 439 U.S. 128, 133-34 (1978); see also Crosby v. Paulk, 187 F.3d 1339, 1346 n. 10 (11th Cir. 1999); Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir. 1995). "Thus, in a variety of circumstances, courts have held that a person does not have a reasonable expectation of privacy in another's belongings." Id. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134; see also United States v. Chaves, 169 F.3d 687, 690 (11th Cir.1999). "And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment ... it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." Rakas, 439 U.S. at 134 (citation omitted).

Ubaldo was not the driver of the truck and trailer that were stopped by Trooper Barnes in Alabama. His presence in the vehicle alone is not sufficient to establish standing to challenge the propriety of the search. United States v. Leal, 2003 WL 21665126, *6 (M.D.Fla. 2003); see also United States v. Chanthasouxat, 342 F.3d 1271, 1273 n. 1 (11th Cir. 2003) (Defendant had no expectation of privacy in the van in which he was a passenger.). Nor did Ubaldo have any ownership or other possessory interest in the vehicle or trailer. In

---

[1] Although the United States labeled this inquiry as a question of standing, "the Supreme Court recently reminded us that the question '"is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."'" United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citing Minnesota v. Carter, 525 U.S. 83, 119 S.Ct. 469, 472, 142 L.Ed.2d 372 (1998)).

order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. United States  v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999).  "A passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the driver owns or rents it." Leal, 2003 WL 21665126 at *6 (citing United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir.1998)).  In this case, Ubaldo has not met his burden to prove that he had a legitimate expectation of privacy in the truck or trailer stopped by Trooper Barnes. Defendant has failed to prove that the search of the Expedition and trailer implicated his Fourth Amendment rights and, thus, he may not contest the search or the evidence seized as a result.

However, to the extent that defendant alleges that the traffic stop and his subsequent detention were unlawful, he does have standing. A passenger in a vehicle generally has standing to challenge the legality of the initial stop and detention. Leal, 2003 WL 21665126 at *7 (citing United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir.2001); see also United States v. Green, 275 F.3d 694, 698-99 (8th Cir. 2002); United States v. Woodrum, 202 F.3d 1, 5-6 (1st Cir.2000); United States v. Roberson, 6 F.3d 1088, 1091 (5th Cir.1993); United States v. Lawson, 782 F.Supp. 1546, 1547-48 (S.D.Fla.1992)). "'Whereas the search of an automobile does not implicate a passenger's fourth amendment rights, a stop results in the seizure of the passenger and driver alike. Thus, a passenger of a stopped automobile does have standing to challenge the seizure as unconstitutional.'" Leal, 2003 WL 21665126 at *7 (citing Roberson, 6 F.3d at 1091 (footnote omitted)); see also U.S. v. Moore, 2006 WL

1232811, *1 (M.D.Fla. 2006) (collecting cases).[2]  Accordingly, the court will address the legality of the traffic stop and defendant's subsequent detention.

2.    Traffic stop

The legality of a traffic stop is analyzed under Terry v. Ohio, 392 U.S. 1 (1968). Pursuant to Terry, "[l]aw enforcement officers may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity."  United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993) (citing Terry v. Ohio, 392 U.S. 1 (1968)).  "The Terry rationale allows police to stop a moving car based on a reasonable suspicion that its occupants are violating the law."  Diaz-Lizaraza, 981 F.2d at 1220. "The reasonable suspicion required for a Terry stop is more than a hunch, at least 'some minimal level of objective justification,' taken from the totality of the circumstances."  Id. at 1220-21 (citation omitted).

In this case, Barnes stopped the Expedition for exceeding the 55 m..p.h. speed limit posted on the highway at that location.  The 55 m.p.h. speed limit sign is visible on the videotape of the traffic stop.  Barnes testified that he confirmed his visual estimation of the Expedition's speed by viewing a lighted highway traffic sign that showed the Expedition's

---

[2]  "A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road, and the police activity that normally amounts to intrusion on 'privacy and personal security' does not normally (and did not here) distinguish between passenger and driver." Brendlin v. California, __ U.S. __. 127 S.Ct. 2400, 2407 (2007).

speed as the truck passed, with radar, and with the calibrated camera in his patrol vehicle. Although the videotape of the stop does not, in the written information automatically registered on the tape, specifically reflect the speed of the truck, the court credits Barnes' testimony in this regard and finds that he had reasonable cause to believe that Garcia was exceeding the speed limit when he stopped the vehicle.

3.    Duration

The next question before the court is whether the traffic stop exceeded its bounds and became an unreasonable seizure under the Fourth Amendment, so that Ubaldo's statements and his consent to search his residence should be deemed invalid. An officer's actions during a traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place," United States v. Purcell, 236 F.3d. 1274, 1277 (11th Cir. 2001), and the duration of the stop must be limited to the time necessary to effectuate the purpose of the stop. Id.

> However, once effectuating a legal stop, an officer has "the duty to investigate suspicious circumstances that then [come] to his attention." *United States v. Harris,* 928 F.2d 1113, 1117 (11th Cir.1991) (citation omitted). The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not "prolong[ ] beyond the time reasonably required to complete that mission." *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Furthermore, an officer can lengthen the detention if he has reasonable suspicion of illegal activity other than the traffic violation, or if the detention has become a consensual encounter. *United States v. Pruitt,* 174 F.3d 1215, 1220 (11th Cir.1999).

United States v. Cantu, 227 Fed.Appx. 783, 785, 2007 WL 986913, 2 (11th Cir. 2007).

In this case, the court cannot conclude that the traffic stop continued beyond a reasonable time, for several reasons. First, Barnes completed the traffic citations at about 2:11 p.m., some 17 minutes after the stop began at approximately 1:54 p.m. This was not an unreasonable amount of time in which to issue the traffic citations, given the discrepancies in the title and registration, Ubaldo's voluntary effort to talk with Barnes, the time that it took to key in and print the citations, and Barnes' attempt to reach the BLOC operator. Second, Barnes was justified in prolonging the stop to complete his investigation through BLOC, which failed to return his initial call. After Barnes waited a reasonable time (about six minutes) for contact from BLOC subsequent to completing the citations, he called BLOC again at approximately 2:17 p.m.. The call ended at 2:21 p.m., about 27 minutes after the stop began. "[P]olice officers conducting a traffic stop may 'prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check.'"

United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003). "Similarly, out of interest for the officer's safety, we have found that officers may permissibly prolong a detention while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation." Id. Although Barnes asked questions during this period that were not directly related to the speeding citations or the license, registration and criminal history check, only "unrelated questions which unreasonably prolong the detention are unlawful; detention, not questioning, is the evil at which Terry's prohibition is aimed. Questions which do not extend the duration of the initial seizure do not exceed the scope of an otherwise constitutional

traffic stop." United States. v. Francis, 140 Fed.Appx. 184, 186 (11th Cir. 2005).

In addition, the law is clear that "[t]he traffic stop may not last 'any longer than necessary to process the traffic violation' *unless there is articulable suspicion of other illegal activity*." Id. at 1278 (citation omitted) (emphasis added); see also United States v. Simms, 385 F.3d 1347, 1353 (11th Cir. 2004); Boyce, 351 F.3d at 1106. Here, Barnes had articulable suspicion of other illegal activity based on a number of factors, considered in combination: (1) the apparent contradiction between the pro-police stickers and Ubaldo's comment that they had had trouble with police in his neighborhood, (2) the strong scent of orange air freshener, (3) the fact that Ubaldo tried to "take over the stop" and speak for Garcia, in the trooper's view, (4) conflicting statements from Garcia about how she had acquired the truck, (5) no valid title, registration or proof of insurance, (6) the fact that Garcia and Ubaldo had driven all the way from Texas for roughly 10 hours, and Garcia did not know exactly where they were going, or know Ubaldo's last name, and (7) the fact that the trailer, which would hold only a single car, was in poor condition for hauling cars cross country. "A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity. Among those factors that have justified further questioning are having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination. ... In particular, the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many of our cases upholding further questioning." United States. v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999).

12

Thus, the factors cited above -- in particular, Garcia's failure to provide proof of authority to operate the vehicle --  gave Barnes an articulable suspicion of illegal activity that was sufficient to permit him to approach Ubaldo for his identification, and to ask additional questions.  Those questions yielded further cause to investigate, based on (1) conflicting reports from Garcia and Ubaldo as to the state to which they were traveling, (2) the fact that the story of traveling to a car auction to pick up a car across country had been cited in Barnes' training as a common "doper" story, (3) Ubaldo's lack of a car dealer's license, and Barnes' belief that a dealer's license is necessary to get into an auction, and (4) Barnes' belief that it was unusual to pay for a car at auction with a credit card rather than cash or a company check. The information returned by BLOC about Garcia's criminal record and Ubaldo's involvement in a prior drug investigation provided additional reason to investigate. Under these circumstances, the court concludes that Barnes did not prolong the stop unnecessarily to seek and receive consent to search from Garcia at approximately 2:24 p.m., nor was it improper for Barnes to carry out the search away from the highway for safety reasons.[3]

4.     Ubaldo's statements

There is no dispute in this case that Ubaldo's initial statements were made to Barnes prior to any <u>Miranda</u> warnings. However, police are not generally required to give <u>Miranda</u>

---

[3]  In addition to the fact that Barnes had an articulable suspicion of illegal activity, once Garcia consented to the search, and Ubaldo agreed to drive the Expedition to the shop, the encounter became consensual.  <u>United States v. Pruitt</u>, 174 F.3d 1215, 1220 (11th Cir. 1999) ("[F]urther questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.").

warnings during ordinary <u>Terry</u> stops.   See <u>Pennsylvania v. Bruder</u>, 488 U.S. 9, 10 (1988)(Persons temporarily detained pursuant to such stops are not "in custody" for the purposes of <u>Miranda</u>.).  Further, to the extent that Ubaldo had been placed in custody before making the statements at issue, it is clear that Barnes did not actively question the defendant to elicit those statements.  "Voluntary and spontaneous comments by an accused, even after <u>Miranda</u> rights are asserted, are admissible evidence if the comments were not made in response to government questioning." <u>Cannady v. Dugger</u>, 931 F.2d 752, 754 (11th Cir.1991); <u>see also</u> <u>United States v. Johnson</u>, 136 Fed.Appx. 279, 283 (11th Cir. 2005). Absent evidence that Ubaldo's statements were the product of interrogation, the statements may not be suppressed.  See <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977) ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. ... Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.").

After agents found cocaine in the trailer axles, Ubaldo received multiple <u>Miranda</u> warnings prior to making further statements.[4]  These warnings were given in English, and Ubaldo's initial motion to suppress (Doc. # 42) contends that he should have been advised of his rights in Spanish. "Before the government may introduce a suspect's uncounselled statement made during custodial interrogation, it must show that the suspect made a

---

[4] Defendant's consent to search itself is not considered to be a self-incriminating statement – that is, evidence of a testimonial or communicative nature – that would require prior <u>Miranda</u> warnings to be admissible. <u>United States v. Hidalgo</u>, 7 F.3d 1566, 1568 (11th Cir. 1993).

voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. ... This showing has two distinct dimensions: (1) relinquishment of the right must have been the product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) waiver must have been made with the awareness of both the right being abandoned and the consequences of the decision to abandon that right. Courts will look at the totality of the circumstances to determine whether the government has met its burden." United States v. Beale, 921 F.2d 1412, 1434-35 (11th Cir. 1991) (citation omitted). "'If a defendant cannot understand the nature of his rights, he cannot waive them intelligently'." United States v. Longoria, 229 Fed.Appx. 885, 887-888, 2007 WL 1371835, 2 (11th Cir. 2007).

In this case, as in Longoria, Ubaldo does not challenge the substance of the Miranda warnings or allege that he was coerced into confessing; rather, he argues only that he did not understand English. However, as in Longoria, the evidence indicates that Ubaldo effectively spoke English and voluntarily engaged in conversations with Barnes in no other language but English before his rights were read to him.  There is no evidence that Ubaldo asked for or needed an interpreter. Further, although Ubaldo has consistently sought the assistance of Spanish language interpreters in proceedings before this court, the court notes that his unsolicited comments at the suppression hearing were offered in English.  See Tr. 39 ("It's not true!"; "That's fine."); 114 ("I don't sign anything."; "Okay.  If I could tell my lawyer ..."). Accordingly, the court concludes that Ubaldo knowingly, voluntarily, and intelligently waived his Miranda rights.

5.    <u>Consent to search</u>

Ubaldo also contends that he did not give voluntary consent to the search of his residence. "A consensual search is constitutional if it is voluntary; if it is the product of an essentially free and unconstrained choice."   <u>United States v. Acosta</u>, 363 F.3d 1141, 1151 (11th Cir. 2004)(citations and internal quotation marks omitted). "Voluntariness is a question of fact based on the totality of the circumstances." <u>Id</u>. "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." <u>Id</u>. (citations and internal quotation marks omitted).  The Eleventh Circuit has

> identified the following factors as relevant in determining whether consent was voluntarily given: (1) whether the individual felt free to leave; (2) the exercise of coercive police procedures; (3) the extent of the individual's cooperation with the police; (4) the individual's awareness of her right to refuse consent, and whether the individual, in fact, could refuse consent; (5) the individual's education and intelligence; and (6) the individual's belief that no incriminating evidence will be found.... Additionally, in evaluating the surrounding circumstances, we take account of " 'subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.'"...We also have held that "[a] suspect does not consent to a search of his residence when his consent to the entry into his residence is prompted by a show of official authority."

<u>United States v. Boulette</u>, 2008 WL 450509, 3-4 (11th Cir. 2008) (slip copy) (citations omitted). In this case, the court concludes that Ubaldo was not free to leave after the cocaine was found in the axles of the trailer.  However, the court has before it no evidence of coercive police tactics used to obtain Ubaldo's consent.  On the contrary, Ubaldo consistently attempted to volunteer information during the course of the stop, even when such information

was not solicited by agents. The written consent form signed by Ubaldo indicates that he was advised of his right to deny permission for the search, and Herman testified that he told Ubaldo what the officers would be looking for, and that he advised Ubaldo that he did not have to sign the form and could withdraw his consent at any time. Under the totality of the circumstances, the court finds that Ubaldo's consent to search was given voluntarily.

6.    Racial profiling

Ubaldo contends that Barnes stopped Garcia's vehicle based on "racial profiling," because he and Garcia are Hispanic. To the extent that Ubaldo claims that the stop was pretextual under the Fourth Amendment, and assuming *arguendo* that Ubaldo has standing to raise this claim, the claim is without merit. The Supreme Court and the Eleventh Circuit have determined that "ulterior motives will not invalidate police conduct based on probable cause to believe a violation of the law occurred." Draper v. Reynolds, 369 F.3d 1270, 1275 (11th Cir. 2004); see also Whren v. United States, 517 U.S. 806, 812-13(1996); United States v. Holloman, 113 F.3d 192, 194 (11th Cir.1997). As the Eleventh Circuit has noted, "under Whren, the constitutional reasonableness of a traffic stop must be determined irrespective of intent, whether of the particular officer involved or of the theoretical reasonable officer." Id. (internal quotation marks and citation omitted). Thus, so long as Barnes possessed probable cause to believe that Garcia committed a traffic violation – as he did, in this case – the stop complied with the Fourth Amendment regardless of any desire Barnes had to intercept drugs, or any other motive he might have had for pulling over the vehicle. Id.

Although the Supreme Court in Whren foreclosed any argument that the constitutional reasonableness of traffic stops under the Fourth Amendment depends on the actual motivations of the individual officers involved, the Court did agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. Whren, 517 U.S. at 813. However, as the Court noted, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." Id. In this case, however, Ubaldo has presented insufficient evidence to establish a selective enforcement claim under the Fourteenth Amendment, even assuming that suppression of evidence is an appropriate remedy for an Equal Protection violation in a criminal case.[5]

The requirements for establishing a selective enforcement claim are set out in the Supreme Court's discussion of selective prosecution in United States v. Armstrong, 517 U.S. 456 (1996); see also United States v. Smith, 231 F.3d 800 (11th Cir. 2000).[6] "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the

---

[5] See, e.g., United States v. Navarro-Camacho, 186 F.3d 701, 711-712 (6th Cir. 1999) (Moore, CJ. concurring in the result)(Expressing the view that suppression of evidence is a viable remedy for an Equal Protection violation in the criminal context).

[6] "Although courts sometimes use the terms selective prosecution and selective enforcement interchangeably, they are fundamentally different. Selective prosecution is a challenge to the prosecutor's decision whether and how to charge the defendant. Selective enforcement is a challenge to the actions of other state officers in determining against whom to enforce the laws." United States v. Garcia, 2000 WL 654377, *12, n. 9 (D.Del.2000). Nevertheless, the basic elements of selective prosecution and selective enforcement claims are the same, although some courts have differed on the proof required to establish these elements.

18

Constitution." <u>Armstrong</u>, 517 U.S. at 463. "[T]he standard [for bringing a selective prosecution claim] is a demanding one." <u>Id</u>. A "presumption of regularity" supports prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. <u>Id</u>. Thus, in the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file, generally rests entirely in his discretion. <u>Id</u>.; <u>see also</u> <u>United States v. Cespedes</u>, 151 F.3d 1329, 1332 (11th Cir. 1998).

However, the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification. <u>Armstrong</u>, 517 U.S. at 464. "A defendant may demonstrate that the administration of a criminal law is 'directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive' that the system of prosecution amounts to 'a practical denial' of equal protection of the law." <u>Id</u>. at 464-65 (citation omitted). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" <u>Id</u>. at 465. The Eleventh Circuit has interpreted <u>Armstrong</u> "as requiring the defendant to produce 'clear' evidence or 'clear and convincing' evidence which is the same thing." <u>Smith</u>, 231 F.3d 800, 808 (11th Cir. 2000).

The court evaluates selective prosecution claims using "ordinary equal protection standards." <u>Id</u>. Specifically, "[t]he claimant must demonstrate that the federal prosecutorial

19

policy had a discriminatory effect and that it was motivated by a discriminatory purpose. To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." Id. "The beginning step in comparing the prosecution of the defendants with the non-prosecution of those who were 'similarly situated' is to determine who, if anyone, was similarly situated with the defendant[]." Id. at 810. The Eleventh Circuit has defined a "similarly situated" person for selective prosecution purposes "as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant – so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan – and against whom the evidence was as strong or stronger than that against the defendant." Id.[7]

Defendant's evidence fails to carry his heavy burden under Armstrong. Ubaldo has

---

[7] Some courts have determined that, "[i]n the context of a challenged traffic stop, ... imposing the similarly situated requirement makes the selective enforcement claim impossible to prove. It would require the defendant to make a credible showing that a similarly situated individual was not stopped by the law enforcement." United States v. Duque-Nava, 315 F.Supp.2d 1144, 1154 (D. Kansas 2004); see also Chavez v. Illinois State Police, 251 F.3d 612, 637 (7th Cir.2001). But see Johnson v. Crooks, 326 F.3d 995, 1000 (8th Cir.2003); Gardenhire v. Schubert, 205 F.3d 303, 319 (6th Cir.2000). The Duque-Nava court, for example, reasoned that in the traffic context, "[i]t is virtually impossible to identify a 'similarly situated' individual who was not stopped." Id. at 1155. "Thus, the defendant challenging a traffic stop for selective enforcement, must be allowed to show discriminatory effect in some other way." Id. The court allowed the defendant to demonstrate discriminatory effect either by showing a similarly situated individual, or by relying on statistical evidence. Id. So far as this court can determine, the Eleventh Circuit has not relieved defendants of the requirement of identifying similarly situated individuals in selective traffic enforcement claims.

not identified any non-Hispanic comparator who engaged in the same type of conduct as Garcia and whom Barnes did not pull over.  Nor has Ubaldo offered any evidence – even without naming specific comparators – that Barnes does not stop whites or African-Americans under similar circumstances.  In short, the court simply has no basis for inferring discriminatory effect in this case.

Not only does Ubaldo fail to prove by clear and convincing evidence that there were similarly situated white or African-American individuals who were not cited, thereby failing to establish discriminatory effect, he also has not proved discriminatory intent by clear and convincing evidence.  Under relevant Supreme Court precedent, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977).  The impact of the official action (whether it bears more heavily on one race than another) may provide an important starting point.  Id.  Among other relevant considerations are the historical background of the challenged decision, the sequence of events leading up the decision, any significant substantive or procedural departures from the ordinary course of events, and contemporary statements.  Id.  In this case, Ubaldo has presented no direct evidence, and insufficient circumstantial evidence, on which to base a finding of discriminatory intent.  Accordingly, Ubaldo has failed to meet his heavy burden to overcome the presumption of regularity that attaches to Barnes' decisions, and his selective enforcement claim is without

21

merit.

## Conclusion

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant Ubaldo's motions to suppress (Doc. ## 42, 84) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before March 31, 2008. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 19th day of March, 2008.


/s/ Susan Russ Walker

SUSAN RUSS WALKER

UNITED STATES MAGISTRATE JUDGE